Mark **ELLIS,** Plaintiff,

v.

William **MEADE,** Penobscot County Sheriff's Department, and Cheryl Gallant,[1] Defendants.

**Civ. No. 94–0163–B.**

United States District Court, D. Maine.

May 1, 1995.

---

**1.** Plaintiff dismissed his claims against Cheryl Gallant on the first day of trial.

Mark S. Kierstead, Waterville, ME, for plaintiff.

Timothy C. Woodcock, Weatherbee, Woodcock, Burlock & Woodcock, Bangor, ME, for defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff, Mark Ellis, brings this action against the Penobscot County Sheriff's Department and William Meade, a former corrections officer at the Penobscot County Jail, pursuant to 42 U.S.C. § 1983 and the Maine Tort Claims Act. He seeks compensation for alleged mistreatment he received while a pretrial detainee at the jail. This matter was tried before the Court without a jury during a week-long trial. The parties have also submitted written final arguments and proposed findings.

### I. Factual Findings

The Court finds the following facts: Mark Ellis was incarcerated at the Penobscot County Jail in June 1991, after suffering a self-inflicted gunshot wound in an attempted suicide. The parties have stipulated that, at all times relevant to this case, Plaintiff was a pretrial detainee. After his incarceration, Ellis made several threats of suicide to jail officials. In addition, he actually attempted suicide on several occasions while incarcerated. As a result, jail officials put Ellis on a strict suicide watch. As part of this regimen, Ellis was allowed to wear only a pair of cutoff prison trousers held up by an elastic waistband.

On October 8, 1991, then Assistant Jail Administrator, Cheryl Gallant, noticed that Plaintiff was wearing a high-school class ring. Fearing that Plaintiff could somehow use the ring to harm himself, Gallant ordered that the ring be removed. Corrections Officer Ty

Babb and Defendant William Meade attempted to convince Plaintiff to give up the ring voluntarily, but Plaintiff refused. A struggle ensued. Plaintiff became more and more upset during this confrontation. With the assistance of Officers Daniel Saunders and Donald Pelkey, Babb and Meade moved Plaintiff to an observation room and restrained him.[2] Plaintiff testified that, at this point, he was crying, sobbing, yelling, and screaming. (Reporter's Notes of Testimony, Ellis at 19, hereinafter "Tr.".)

Once Plaintiff was restrained, Defendant Meade touched Plaintiff's buttocks. This contact was described in a number of different ways. At trial, Plaintiff referred to the contact variously as a "tap," a "pat," and a "slap." (Ellis Tr. at 88–89.) When asked to describe the contact, Plaintiff testified: "They ... didn't hurt. It was done pretty easy, actually ... in what I would call a sexual form." (Ellis Tr. at 88.) He also demonstrated the contact as a light tapping. (Ellis Tr. at 90.) He testified that Meade slapped or patted him between two and ten times.

Defendant Meade similarly characterized the contact as "an easy spank" or "an easy tap." (Meade Tr. at 36.) Meade also described the incident as being similar to spanking a diapered baby. (*Id.*) Saunders "liken[ed] it to what a coach does to a football player." (Saunders Tr. at 19.) Babb portrayed the contact, not as a "spank," but as a "tap." (Babb Tr. at 12.) Pelkey did not witness the incident at all. (Pelkey Tr. at 3.) Based on the testimony at trial, the Court finds that Defendant Meade lightly slapped or patted Plaintiff's buttocks several times while he was restrained.

There was some dispute about whether Defendant Meade slapped or patted Plaintiff on his bare skin or on his shorts. Plaintiff testified that Meade pulled down his shorts and slapped him on bare skin. (Ellis Tr. at 20.) Meade denied pulling Plaintiff's shorts down or hitting bare skin. (Meade Tr. at 10.) Saunders testified that Plaintiff's shorts were all the way up. (Saunders Tr. at 11.) Babb testified that Plaintiff's pants were partially down because of the struggle and that Meade pulled them back up after the pat. (Babb Tr. at 13, 40.) The Court finds that Defendant Meade did not pull Plaintiff's shorts down. The Court also finds that Defendant Meade may have inadvertently touched some bare skin as well as clothed portions of Plaintiff's body.

There was also some dispute over the purpose of this contact. Plaintiff testified that the contact was not of a disciplinary nature, but rather described the contact as "sexual." (Ellis Tr. at 88.) Defendant Meade, on the other hand, asserts that the purpose of the contact was to calm Plaintiff. (Meade Tr. at 17.) The Court finds Defendant's explanation more credible than that offered by Plaintiff. This conclusion is supported by the virtually unanimous testimony that, during this incident, Meade commented to Plaintiff something to the effect that, "If you calm down, the restraints will be removed." (Ellis Tr. at 22, Meade Tr. at 10.) The Court concludes that Defendant Meade's intent in patting Plaintiff was, although inappropriate, an effort to calm Plaintiff.[3]

Plaintiff testified that, after the so-called "spanking" incident, the guards left him alone for a few minutes but that Meade returned to the cell, while Plaintiff was still in restraints, slapped him again on the buttocks and then fondled his genitals. (Ellis at 21.) The Court does not find Plaintiff's testimony regarding this incident credible. Defendant Meade flatly denies any second slapping or fondling. (Meade Tr. at 18–19.) The other officers on duty testified that, despite

---

2. There is some dispute in the testimony as to how Plaintiff was restrained. Babb testified that Plaintiff was restrained by so-called "humane restraints" or leather shackles. Defendant Meade testified that Plaintiff was restrained, not with leather shackles, but with handcuffs and metal shackles. Plaintiff testified that both leather and metal restraints were used. (Ellis Tr. at 16.) There is no dispute, however, that Plaintiff was fully restrained with shackles of some form.

3. The Court rejects Plaintiff's counsel's attempts to characterize this so-called "spanking" incident as a "corporal punishment." (Pl.'s Post–Trial Br. at 19 (hereinafter "Pl.'s Br.").) Such a depiction is not supported by any of the testimony at trial, including Plaintiff's own testimony.

the fact that they were in a position to see someone enter Plaintiff's cell, they did not observe Meade entering that space until after Plaintiff was removed from the restraints. (Babb Tr. at 43–44.) The Court finds that neither a second slapping incident nor any fondling of Plaintiff's genitals occurred.

Plaintiff testified that, on January 15, 1992, Defendant Meade walked by him and said "How are you doing little boy ... how's the little guy doing?" while looking toward Plaintiff's groin area. (Ellis Tr. at 33.) A social worker who overheard the exchange remembered Meade's comment similarly as "How's the little boy doing?" and, after a response from Plaintiff, "So the little guy's doing OK?" (Maietta Tr. at 3.) The social worker did not testify that Meade looked at Plaintiff's groin area during this exchange. Defendant Meade remembers addressing Plaintiff,[4] but denies any sexual connotation or intent in his comments. (Meade Tr. at 19–20.) The Court finds that, on January 15, 1992, Defendant Meade did make a comment to Plaintiff something to the effect of "How are you doing little boy ... how's the little guy doing?" but is not persuaded that Meade was looking toward Plaintiff's groin during this interchange.

In response to Ellis's complaints, jail officials reviewed Meade's conduct and concluded that Meade's conduct on October 8, 1991 violated jail regulations regarding contact with prisoners and constituted incompetence and conduct unbecoming an officer. (Pl.'s Ex. 24.) Meade was punished with a written reprimand. (*Id.*) Officials also concluded that Meade's references to prisoners as "little guy" or "big boy" was discourteous and was in violation of the Corrections Service Manual. (Pl.'s Ex. 8.) Meade received additional training and a written warning as a result of his comment. (*Id.*)

Plaintiff also testified that Defendant Meade often inappropriately observed him taking showers. (Ellis Tr. 31–32.) Then Assistant Jail Administrator, Cheryl Gallant, testified, however, that she ordered that Plaintiff be watched closely while in the shower area. (Gallant Tr. at 41.) At least one of the factors Gallant considered in issuing this order was the fact that Plaintiff had previously removed a light bulb from the shower area, *id.*; which he intended to break and use to reopen the incision from his self-inflicted gunshot wound. (Ellis Tr. at 75–76.)

Plaintiff argues that Defendants are liable to him under both the Maine Tort Claims Act and 42 U.S.C. § 1983.[5]

## II. Liability of Defendant Meade

### A. Fondling—Counts II and VI

Plaintiff alleges that Defendant Meade sexually assaulted him by fondling his genitals while he was in restraints. He argues that this conduct is actionable both under the Maine Tort Claims Act (Count II) and § 1983 (Count VI). The Court agrees that such conduct, if proven, could well be actionable. *Gilson v. Cox,* 711 F.Supp. 354, 356 (E.D.Mich.1989) (summary judgment denied in part because alleged fondling of prisoner's genitals, if proven, could be actionable). Because the Court has already concluded, however, that the alleged conduct did not occur, there remain no factual underpinnings to support these claims. Accordingly, judgment is entered for Defendant Meade as to Count II, and as to Count VI as it relates to any alleged fondling.

### B. Sexual Harassment—Counts V and VI

Plaintiff also alleges that Meade's comment "How are you doing little boy ... how's the little guy doing?" constituted sexual harassment. In Count V, Plaintiff asserts that Meade is liable to him for this comment under the Maine Tort Claims Act. Plaintiff has not, however, provided the Court with any authority for finding that Meade's comment would result in liability under the Maine Tort Claims Act, or, for that matter, under Maine tort law generally. Accordingly, the Court concludes that judgment on Count V should be entered in favor of Defendant Meade.

---

**4.** Meade remembers the language somewhat differently. He remembers saying "How you doing, Big Boy?" (Meade Tr. at 19–20.)

**5.** At the inception of the trial, Plaintiff voluntarily dismissed Counts III, IV, and VIII.

In Count VI, Plaintiff alleges that Defendant Meade's comment also violates his constitutional rights. The Court disagrees. "Verbal threats and name calling usually are not actionable under § 1983." *McDowell v. Jones,* 990 F.2d 433, 434 (8th Cir.1993). Even threatening language by guards does not always violate the constitutional rights of prisoners. *See, e.g., Coyle v. Hughs,* 436 F.Supp. 591, 593 (W.D.Okl.1977) ("Mere threatening language and gestures of a custodial officer do not . . . amount to constitutional violations."); *Bolden v. Mandel,* 385 F.Supp. 761, 764 (D.Md.1974) (holding verbal abuse and threats of bodily harm not actionable under § 1983; "Were a prisoner . . . entitled to a jury trial each time that he was threatened with violence by a prison guard, even though no injury resulted, the federal courts would be more burdened than ever with trials of prisoner suits. . . .").

Defendant Meade's isolated comment, although inappropriate, does not approach a constitutional violation. The comment made no suggestion of any threat of violence. Further, although Plaintiff characterizes the comment as "sexual harassment," the Court is not persuaded that the comment held any sexual connotations.[6] Because the Plaintiff has not established any constitutional violation, the Court concludes that judgment on Count VI in favor of Defendant Meade, as it relates to the alleged sexual harassment, is appropriate.

## C. "Spanking"—Counts I and VI

Finally, Plaintiff claims that he is entitled to recover under the Maine Tort Claims Act (Count I) and 42 U.S.C. § 1983 (Count VI) for the so-called "spanking" incident.

### 1. Section 1983

Plaintiff asserts that, by patting him on the buttocks, Defendant Meade violated Plaintiff's constitutional right "to be free from unreasonable searches under the Fourth and Fourteenth Amendments" as well as his right

"to be free from punishment pursuant to the Fifth and Fourteenth Amendments." (Pl.'s Br. at 24.)

The Court concludes that the contact in question in this case cannot be characterized as a "search" for purposes of the Fourth Amendment. Furthermore, this factual scenario cannot be interpreted by any thoughtful analysis to support a right to privacy argument. Accordingly, the Court finds Plaintiff's argument under the Fourth and Fourteenth Amendments to be without merit.

The Court next turns to Plaintiff's due process arguments. The First Circuit Court of Appeals has stated that, generally, when evaluating the confinement of a pretrial detainee, "the pertinent constitutional guarantee" is not the Eighth Amendment's prohibition against cruel and unusual punishment, but rather "the Due Process Clause of the Fourteenth Amendment." *Lyons v. Powell,* 838 F.2d 28, 29 (1st Cir.1988) (quoting *Ingraham v. Wright,* 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977)); *see also Bell v. Wolfish,* 441 U.S. 520, 534, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979) ("[W]hat *is* at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment. . . .") (emphasis in original).

The proper inquiry, therefore, is whether Defendant's treatment of Plaintiff amounts to punishment. *Lyons,* 838 F.2d at 29. In order to decide whether the treatment of a pretrial detainee constitutes punishment:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will

---

6. The Court notes that, in his Complaint, Plaintiff asserted that Meade's comment violated his right to equal protection. The Equal Protection Clause provides individuals with the "right to be free from invidious discrimination in statutory classifications and other governmental activity."

*Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). Plaintiff makes no such allegations and therefore fails to make out any claim under the Equal Protection Clause.

turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].

*Lyons,* 838 F.2d at 29 (quoting *Bell,* 441 U.S. at 538, 99 S.Ct. at 1873 (internal quotations and citations omitted)).

Despite Plaintiff's counsel's attempt to characterize the incident as "corporal punishment," (Pl.'s Br. at 19), there has been no showing of an "expressed intent to punish on the part of detention facility officials" in this case. *Id.* None of the witnesses, including Plaintiff himself, testified that Meade intended to pat or slap Plaintiff as a means of corporal punishment. In fact, Plaintiff specifically testified that the contact was not of a "disciplinary nature." (Ellis Tr. at 88.)

■ Since the express purpose of Defendant Meade was not to punish, the Court must next determine what his purpose was and whether that purpose was legitimate. *Lyons,* 838 F.2d at 29. The Court has already found that Defendant Meade's purpose was to placate Plaintiff. Calming a distraught prisoner is certainly a legitimate governmental objective.

■ Finally, the Court must decide whether Meade's action "may rationally be connected" to his stated purpose and whether his action appears excessive in light of that purpose. If an action "appears to be unrelated to a legitimate governmental objective, and is, for example, arbitrary or purposeless, then a court may infer that it is intended to be punishment." *Lyons,* 838 F.2d at 29 (citing *Bell,* 441 U.S. at 539, 99 S.Ct. at 1874.) Although Meade's actions were inappropriate and unsuccessful, the Court is nevertheless satisfied that this pat-

ting could rationally be connected to Meade's stated purpose and was not excessive. The contact was an isolated incident of physical contact. It was brief and, according to Plaintiff, "didn't hurt." (Ellis Tr. at 88.) The patting was accompanied by a verbal attempt to calm Plaintiff. The action was not prompted by ill will or malice. Based on the nature of this contact, the Court concludes that Defendant Meade's conduct was not so arbitrary or purposeless so as to lead to an inference of an intent to punish Plaintiff.

Accordingly, the Court concludes that Defendant Meade did not violate Plaintiff's right, as a pretrial detainee, to be free from punishment. Judgment on Count VI as it relates to the so-called "spanking" incident will be entered for Defendant Meade.

### 2. Maine Tort Claims Act

■ Plaintiff also alleges that Defendant Meade committed assault and battery by patting him on the buttocks. Defendant responds that Plaintiff waived any claims he had under the Maine Tort Claims Act, 14 M.R.S.A. §§ 8101–8118 (1980 & Supp.1995), by not mentioning the Act in his Complaint. The Court finds this contention to be without merit.[7]

■ Defendant next argues, in the alternative, that his actions are immune from liability under § 8111(1)(C) and § 8111(1)(E). Those provisions provide as follows:

Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:

. . . . .

---

**7.** The Maine Tort Claims Act does not provide plaintiffs seeking to sue governmental entities or their employees with a substantive cause of action. Rather, "the Maine Tort Claims Act is the statutory reformulation of the doctrine of sovereign immunity." *Rutherford v. City of Portland,* 494 A.2d 673, 675 (Me.1985). The Maine Tort Claims Act governs tort actions brought against governmental entities and their employees. *See* 14 M.R.S.A. § 8103 ("all governmental entities shall be immune from suit on *any and all tort claims* seeking recovery of damages . . . .") (emphasis added); and 14 M.R.S.A. § 8111(1) "em-

ployees of governmental entities shall be absolutely immune from *personal civil liability* (under certain circumstances)" (emphasis added). Moreover, the Act's protections cannot "be waived by imposition of procedural requirements or forfeited by procedural defaults." *Rutherford,* 494 A.2d at 675. Plaintiff brought this tort action for assault and battery against Defendant Meade for Meade's conduct while on the job. The action is, accordingly, well within the ambit of the Maine Tort Claims Act and Plaintiff has not—and the Court suspects, could not—waive the applicability of that Act.

C. Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid; [or]

.    .    .    .    .

E. Any intentional act or omission within the course and scope of employment; provided that such immunity shall not exist in any case in which an employee's actions are found to have been in bad faith.

14 M.R.S.A. § 8111(1)(C), (E) (Supp.1995).

■ The Court is aware of no cases in which the Maine Supreme Judicial Court has discussed the application of § 8111(1)(E), and only one case in which that court even mentioned that provision, *see Dall v. Caron,* 628 A.2d 117, 119 (Me.1993) (holding that "bad faith proviso" found in § 8111(1)(E) did not apply to remainder of § 8111(1)). The Maine Supreme Judicial Court has made it clear, however, that § 8111(1)(C) provides immunity from intentional tort claims "as long as the[ ] conduct is not so egregious that 'it exceeds, as a matter of law, the scope of any discretion [the defendants] could have possessed in their official capacity.' " *Bowen v. Department of Human Servs.,* 606 A.2d 1051, 1055 (Me.1992) (quoting *Polley v. Atwell,* 581 A.2d 410, 414 (Me.1990)). Therefore, while both § 8111(1)(C) and § 8111(1)(E) arguably apply to the facts of this case, the Court first considers the discretionary function immunity provided by § 8111(1)(C).

"In determining whether an officer is carrying out a discretionary function, Maine courts focus on whether [the defendant] is required to use his judgment while acting in furtherance of a departmental policy of legislatively imposed duty." *McLain v. Milligan,* 847 F.Supp. 970, 977 (D.Me.1994) (citing *Moore v. Lewiston,* 596 A.2d 612, 616 (Me. 1991)). The Court is satisfied that the management and care of prisoners is more than a ministerial function. It requires the use of

an officer's judgment. Accordingly, the Court concludes that such activity constitutes the carrying out of a discretionary function.

The Court also concludes that Defendant Meade's conduct was not "so egregious that it exceed[ed], as a matter of law, the scope of any discretion [he] could have possessed." *Bowen,* 606 A.2d at 1055 (citation & internal quotations omitted). Defendant Meade's actions, while perhaps mistaken and ill-advised, were neither wanton nor oppressive. *See Leach v. Betters,* 599 A.2d 424, 426 (Me.1991) (finding discretionary function immunity where police officers' actions may have been mistaken but could not be characterized as either wanton or oppressive). Moreover, there is no persuasive evidence that Defendant Meade was motivated by ill will, bad faith, or an improper motive. *Id.* Rather, the Court has already found that Defendant Meade was attempting to calm Plaintiff. Accordingly, the Court concludes that Defendant Meade is entitled to discretionary function immunity under the Maine Tort Claims Act. Because the Court finds discretionary function immunity, it need not reach the immunity provided under § 8111(1)(E). Judgment on Count I will be entered in favor of Defendant Meade.

### III. Liability of Penobscot County Sheriff's Department

In addition to his claims against Defendant Meade, Plaintiff also brought claims against the Penobscot County Sheriff's Department. He claims that the Sheriff's Department is liable under 42 U.S.C. § 1983.[8] He argues that this liability results from Defendant Meade's alleged fondling, sexual harassment, and so-called spanking, which have been discussed above. Because the Court has already concluded, however, that none of these actions resulted in a constitutional or statutory violation, the Department cannot be liable under § 1983 for those acts.

■ Plaintiff also contends that the Department should be liable under § 1983 because Defendant Meade observed him too

---

8. Although Defendant addresses the liability of the Department both under the Maine Tort Claims Act and § 1983, (Def.'s Br. at 51–53); Plaintiff's Complaint alleges only § 1983 viola-

tions against the Department. The Court, therefore, examines only whether the Department is liable under § 1983.

closely in the shower.[9] (Compl. ¶ 30.) Plaintiff argues that Meade's observation of him "violates the rights secured to the Plaintiff by the Fourth and Fourteenth Amendments ... [as] a gross invasion of his privacy and person and a deprivation of his liberty." (Pl.'s Br. at 13.) For purposes of analyzing this argument, the Court assumes that pretrial detainees retain some Fourth Amendment rights upon commitment to a corrections facility. *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979) (assuming arguendo that inmates retain some Fourth Amendment rights upon commitment); *see also Cookish v. Powell*, 945 F.2d 441, 446 (1st Cir.1991) (some Fourth Amendment protection available to inmates as to their persons). The Fourth Amendment, however, prohibits only "unreasonable searches." *Id.*

Under the circumstances of his case, the Court concludes that Defendant Meade's observation of Plaintiff did not violate his constitutional rights. First, the observation was by a guard of the same sex. *Cf. Cookish*, 945 F.2d at 447 (more than restricted observation of a nude prisoner by a guard of the opposite sex "would (in all likelihood) violate the Fourth Amendment, *except* in an emergency condition.") Second and more important, Plaintiff's own behavior provided ample justification for Meade's more-than-casual observations. The Court acknowledges that "[t]he feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute." *Rodriguez v. Kincheloe*, 763 F.Supp. 463, 470 (E.D.Wa.1991). *aff'd*, 967 F.2d 590 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1318, 122 L.Ed.2d 704 (1993) (citation omitted). Plaintiff's privacy right, however, is far outweighed by Defendants' justifiable concerns for Plaintiff's own safety. At the time of the allegedly overzealous shower observation, Plaintiff was on a suicide watch. By his own admission, Plaintiff had removed a light bulb from the shower area for the express purpose of injuring himself. Under these circumstances, the observations of Plaintiff while he was showering were reasonably ordered by the Assistant Jail Administrator and thus did not violate any Fourth Amendment rights Plaintiff may have had.

Because Plaintiff has suffered no constitutional injuries or deprivations, the Court concludes that the Penobscot County Sheriff's Department cannot be liable to him under 42 U.S.C. § 1983.[10] Accordingly, judgment will be entered on behalf of both Defendants on Counts VI and VII.

#### IV.  Conclusion

In light of the Court's conclusions outlined above, the Court orders that *JUDGMENT* be entered for Defendant Meade on Counts I, II, V, and VI; and for Defendant Penobscot County Sheriff's Department on Count VI and VII.

*SO ORDERED.*

---

9. In his Complaint, Plaintiff also alleged that Defendant Meade unnecessarily strip searched him. He withdrew this claim, however, at the end of the trial.

10. The Court notes that Defendants raised a number of other meritorious issues which weigh against liability by the Sheriff's Department. For example, they question whether the Sheriff's Department is a proper party and whether Plaintiff properly alleged any violation of a policy, custom, or practice. Because the Court has concluded, however, Plaintiff's constitutional rights were not violated, the Court need not reach those issues.