Fecteau, J.
The plaintiff, Brandon Roberts, is presently incarcerated at the Massachusetts Correctional Institution Cedar Junction in Walpole, Massachusetts (MCI-Walpole). Plaintiff, acting for himself and six other inmates, filed this action pro se on February 26, 2002 against the Massachusetts Department of Correction, Michael Maloney, Commissioner of Correction, Peter Allen, Superintendent of MCI-Walpole, and correctional officers Captain Christopher Crown and Sergeant Thomas Dayton. On May 10, 2002 this Court granted defendants’ Motion to Strike all Plaintiffs except for Brandon Roberts for failure of the other named plaintiffs to sign the complaint. Subsequently, the plaintiff filed an amended complaint on May 20, 2002 adding Edward Harris as a plaintiff and signatory. In this action the plaintiffs seek declaratory relief that a strip search conducted by prison officials on December 11, 2001 was performed illegally in violation of both state and federal law; injunctive relief prohibiting unwarranted strip searches; and compensatory and punitive damages.
This matter is before the Court on defendants’ Motion to Dismiss under Mass.R.Civ.P. 12(b)(6) and/or Motion for Summary Judgment under Mass.R.Civ.P. 56. The Court has reviewed the supplemental materials filed with defendants’ motion. Therefore, the defendants’ Motion to Dismiss must be denied and in the alternative, the Court will consider the defendants’ Motion for Summary Judgment.
BACKGROUND
The undisputed facts as revealed by the summary judgment record are as follows.
The plaintiff, Brandon Roberts, is an inmate incarcerated at MCI-Walpole. On December 11, 2001 at approximately 3:25 p.m., a fight broke out between two inmates in the recreational yard on the grounds of the prison. An officer in Tower 5 sounded the alarm and an emergency response team arrived shortly thereafter. Based on an officer report that a weapon had been sighted, the team cordoned off the area where the inmates had gathered to watch the fight. Because of the nature of the disturbance and the possibility that a weapon might be involved, Captain Christopher Crown ordered an immediate search of all the inmates remaining in the yard, including those men involved in the altercation. The search was conducted in the West Wing corridor of the prison.
The search was conducted entirely by male correctional officers following the Department of Correction’s Search Policy procedure for strip searches. Approximately thirty inmates were searched, five at a time. A correctional officer stood at the entrance of the corridor directing the flow of inmates in and out. During the search an officer was assigned to each inmate. Each inmate was required to submit to a full strip search including a visual body cavity search. The entire search process for each inmate took approximately three to five minutes.
DISCUSSION I. Standard of Review
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); *370 Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motor Corp., 410 Mass. 706, 716 (1991).
II. The Strip Search
Plaintiffs filed this action under 42 U.S.C. §1983 asserting that they were deprived of their rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.[1] In order to establish a claim under 42 U.S.C. §1983, the plaintiffs must show “that they were deprived of a right, privilege or immunity secured by the constitution or laws of the United States by a person acting under color of [state] law.” Fernandez v. Rapone, 926 F.Sup. 255 (D.Mass. 1996).
Plaintiffs assert that the strip search conducted on December 11, 2001 at MCI-Walpole was done in violation of federal constitutional law specifically implicating their rights under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.[2] The plaintiffs complain that it was unnecessary to strip search the entire population in the prison yard at the time of the fight since the tower guard had identified the two men involved in the altercation. He next complains that the strip search was conducted in a prison corridor where the inmates could be seen by both male and female staff as well as “civilians” in the area.
A. The Fourth Amendment
Strip searches have been recognized by the courts as a reasonable means to protect both the prison population and the prison staff from the danger of weapons and to ensure that contraband — money, drugs — are not being brought into the prison. See Langton v. Commissioner of Correction, 404 Mass. 165 (1989). A prisoner does not forfeit all constitutional protections as a result of his incarceration, however, those rights must be subordinate to the important and necessary objectives of maintaining safely and security in the prison environment. See Bell v. Wolfish, 441 U.S. 520, 545 (1979); Fernandez v. Rapone, 926 F.Sup. at 255. Whether there has been a violation of the prisoner’s Fourth Amendment privacy rights must be evaluated within this context. Such an evaluation must turn on balancing the circumstances necessitating the actions of the officers in conducting the strip search, and the protection of the inmates’ Fourth Amendment rights. See Bell v. Wolfish, 410 U.S. at 560 (recognizing prison officials’ “legitimate and significant” interest in maintaining the security of the prison). In making that determination, courts “should be deferential to the experienced judgment of prison administrators.” Fernandez v. Rapone, 926 F.Sup. at 260-61, and cases cited therein. The search will be upheld if it is reasonable under the circumstances. See Arruda v. Fair, 547 F.Sup. 1324, 1332 (D.Mass. 1982). To determine reasonableness the Court must balance the need for the search against the invasion of the prisoner’s privacy rights. See Wolfish v. Bell, 410 U.S. at 559. The test includes an evaluation of the scope of the search, the manner in which it was conducted, the justification for the search and the locale where it takes place. Id.
Section 506.03 of the Department of Correction Search Policy details the procedures to be used for strip searches of inmates. That policy authorizes strip searches for “routine security checks” or where there has been a “specific suspicious incident.” Routine security checks include searching an inmate before and after court appearances, before and after a doctor or other medical visit, and when going to or coming from a secure perimeter area. In addition, and of greater pertinence here, a strip search, including a visual body cavity search, is authorized when an officer has reason to believe that an inmate is in possession of contraband or after a disciplinary infraction. The policy fully details the search technique to be employed, instructing that it should be done in “relative privacy.”
In this instance, the security officers conducting the search did so in compliance with departmental policy. The search was instituted in response to a prison-yard fight between two inmates and was based on the possible sighting of a weapon. There was an emergency nature to the search in that the possibility of a weapon amongst the prison population posed a serious threat of danger to both prisoners and correctional officers. Under the circumstances, choosing to institute the search immediately and to use the closest area within the facility that was readily available, addressed the officers’ safety concerns.
In addition, the plaintiffs do not allege that the search was done in an abusive manner. There is no allegation that the officers verbally or physically harassed the prisoners. Compare, Arruda v. Fair, 547 F.Sup. at 1324 (officers’ degrading jokes during strip search of inmate, not enough to render the search unreasonable). Nor, do the plaintiffs complain that the search involved female officers; no female officers were present. But see, Cookish v. Powell, 945 F.2d 441, 446-47 (1st Cir. 1991) (presence of a female officer during strip search would not violate privacy rights of an inmate during times of emergency). Rather, the plaintiffs complain that the location of the search — the West Wing corridor adjacent to the Medical Services Unit — was unreasonable because, during the three to *371 five minutes while they were being strip searched, it was possible that they could be viewed by others. The officer’s decision to conduct the search in the West Wing corridor did not violate the department’s relative privacy policy. Any viewing of the strip search by others would, at most, be brief and inadvertent. See Cookish v. Powell, 945 F.2d at 447 (inadvertent, occasional or casual observation of an inmate being strip searched does not rise to the level of a constitutional infringement). Regardless, in an emergency situation, such that existed here, the officers were warranted in securing the area and conducting an immediate search.
The courts should not second guess prison administrators when it comes to safety and security within the prison environment. See Wolfish v. Bell, 410 U.S. at 545. “A detention facility is fraught with serious security dangers” and those dangers are best dealt with by those charged with the responsibility of maintaining the security and order. Id. at 549. See also Arruda v. Fair, 547 F.Sup. at 1333 (must show substantial evidence that prison officials are exaggerating a security need in order to overturn search policy). The autonomy of prison officials in this area has been widely recognized and courts must defer to their expertise and experience in maintaining a safe and orderly environment within the prison walls. See Wolfish v. Bell, 410 U.S. at 547; Jones v. North Carolina Prisoners’ Labor Union, Inc., 433 U.S. 119, 132-33 (1977) (holding that prison officials’ determination to prohibit union meetings, solicitation of prisoners and distribution of union materials as reasonably related to maintaining order and securiiy).
B. The Eighth Amendment
Plaintiffs next complain that the strip search violated their Eighth Amendment rights under the United States Constitution to be free from “cruel and unusual punishment.” Whether a particular strip search implicates the Eighth Amendment is determined by analyzing whether the procedure employed was “rationally related to a legitimate nonpunitive governmental purpose and whether [the particular search was] excessive in relation to that purpose.” Bell v. Wolfish, 410 at 561. In order to support this claim, plaintiffs must show that in conducting the strip search prison officials acted in a deliberate and indifferent manner to a substantial risk of a serious harm to the inmates. The plaintiffs must show not only that they were subjected to “unnecessary and wanton infliction of pain” but also that the responsible official(s) acted with a culpable state of mind, that is, that the officials knew of, but nevertheless consciously disregarded, an excessive risk of health or safety. See Farmer v. Brennan, 511 U.S. 825, 834 (1994).
Plaintiffs assert that the search itself was instituted for the purpose of punishment. But plaintiffs discount the event that necessitated the search. A prison-yard fight had broken out between two inmates and there was a real possibility that one of the inmates had secured a weapon. Additional security was called to the yard and the prisoners were detained while a man-by-man search was conducted. The response of the prison staff was immediate and appropriately tempered to the nature of the situation. See Cornwell v. Dahlberg, 963 F.2d 912 (1992) (finding strip search of prisoners conducted outdoors on cold, muddy ground after prison uprising a reasonable response to an emergency situation). Under the circumstances, the correctional officers’ response to the emergency situation was neither an “unnecessary or wanton infliction of pain” nor did they institute the search with a conscious disregard for the risk of harm. There was no violation of the plaintiffs’ constitutional rights under the Eighth Amendment.
C. Fourteenth Amendment
Plaintiffs also allege that, as a result of the prison-yard detention during the course of the search, they have been denied a protected liberty interest under the Fourteenth Amendment to the United States Constitution. While a sentenced prisoner may claim a further deprivation of a liberty interest beyond that already imposed by incarceration, that liberty interest is nevertheless subject to limitations and restrictions necessitated by the “legitimate goals and polices of the penal institution.” Wolfish v. Bell, 441 U.S. at 546. In order to prevail on this claim, the plaintiffs must show “1) a specific liberty or property interest protected by the Fourteenth Amendment has been violated, or 2) [that] the state’s conduct ‘shocks the conscience.’ ” Fernandez v. Rapone, 926 F.Sup. at 262. In this instance, the decision of the correctional officers to impose a limited detention and subsequent search of the plaintiffs was warranted in light of the officers’ articulated concerns that one of the prisoners may have secured a weapon. The isolation of the plaintiffs in the prison yard and the subsequent strip search, grounded in the belief that there had been a breach of security, could not be construed so as to “offend the community’s sense of fair play and decency.” Fernandez v. Rapone, 926 F.Sup. at 263, quoting Rochin v. California, 342 U.S. 165, 169 (1952). The plaintiffs have produced no evidence that would support their allegation of a denial of a liberty interest under either approach.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendants’ motion to dismiss is denied and defendants’ motion for summary judgment is GRANTED.

An action by a prisoner alleging the unconstitutionality of certain prison conditions, including specific acts as well as general prison conditions, must first be addressed through the available grievance procedures. See 42 U.S.C. §1997(e)(a). After the prisoner has exhausted all available administrative remedies, a Section 1983 action is appropriate. This requirement applies to all actions whether brought in state or federal court. See Megna v. Correctional Medical Services, Inc., 15 Mass. L. Rptr. 58, 2002 WL 1828175 (Mass.Super.). In the *372 instant case, there is no evidence in the record of what mechanisms are available to the plaintiffs for redressing their grievances or, whether they have or have not complied with this procedural requirement.

In addition to the plaintiffs’ allegations that they have been denied guarantees under the federal constitution, plaintiffs also allege that they have been deprived of state constitutional guarantees under arts. 10, 12, 14, and 26 of the Declaration of Rights. However, as has oft been noted, the denial of a state constitutional right cannot be addressed by a Section 1983 claim. Section 1983 specifically provides relief only where federal statutoiy or constitutional rights have been denied. See Macone v. Town of Wakefield, 277 F.3d 1 (2002) (D.Mass.).