**Dennis R. COOKISH, Plaintiff, Appellee,**

v.

**Commissioner Ronald POWELL, et al., Defendants, Appellants.**

**No. 90–2225.**

United States Court of Appeals,
First Circuit.

Submitted May 1, 1991.
Decided Sept. 26, 1991.

---

John P. Arnold, Atty. Gen. and Claire L. Gregory, Asst. Atty. Gen., on brief for defendants, appellants.

Dennis R. Cookish, plaintiff, appellee on brief pro se.

Before BREYER, Chief Judge, and CAMPBELL and SELYA, Circuit Judges.

PER CURIAM.

The plaintiff, Dennis R. Cookish, an inmate at the New Hampshire State Prison, filed a complaint, pursuant to 42 U.S.C. § 1983, in the District Court for the District of New Hampshire, alleging, inter alia, that the defendants, officials at the prison, violated his Fourth Amendment right to be free from unreasonable searches when female correctional officers supervised and/or observed him during a visual body cavity search.[1] The defendants moved for summary judgment, contending, as an initial matter, that no Fourth Amendment violation occurred and, secondly, assuming *arguendo* the existence of such a violation, they were entitled to qualified immunity for their actions. The district court denied summary judgment, finding that there existed "a material issue of fact,"[2] precluding the entry of summary judgment. On that same basis, the court denied the defendants' claim of qualified immunity. The defendants[3] have appealed this denial of qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–18, 86 L.Ed.2d 411 (1985) (an interlocutory appeal is allowed from the denial of summary judgment on the ground of qualified immunity). We reverse and remand to the district court for entry of judgment in favor of appellants on this Fourth Amendment claim as they are entitled to qualified immunity.

I.

We begin with the legal framework. "Qualified immunity operates to shield government officials exercising discretionary powers 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Morales v. Ramirez*, 906 F.2d 784, 787 (1st Cir.1990) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). A "clearly established" right in the qualified immunity context has a

---

1. A magistrate judge recommended that the remaining claims be dismissed. After consideration of the plaintiff's timely objections, the district court approved the magistrate's report and recommendation. The only claim before us on this interlocutory appeal is that alleging the unlawfulness of the search as conducted within the visual vantage point of female correctional officers.

2. The language of the summary judgment rule precludes the entry of summary judgment if there is a "genuine issue as to any material fact." Fed.R.Civ.P. 56(c). And, the district court cited this language in the course of its ruling on the summary judgment motion. Al-

though the court thereafter referred to the existence of a "material issue of fact," we do not believe, nor do the appellants suggest, that this alteration in language indicates that the court applied an incorrect standard in determining the motion.

3. Certain defendants were dismissed at plaintiff's request. The court dismissed other defendants, either completely, or in their individual capacities. The only defendants presently before us are defendants Correctional Major George Ash, Correctional Captain Christopher Metalious, and Correctional Lieutenant Janet Lyden.

particularized cast. *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* That is to say, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* The inquiry focuses on an evaluation of the defendants' conduct "in light of the particular circumstances known at the time the challenged conduct took place." *Brennan v. Hendrigan*, 888 F.2d 189, 192 (1st Cir.1989). Should the defendants reasonably have comprehended that their specific actions transgressed a clearly established right? *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). "Defendants are liable for damages only if they *should have known* that *what they did* violated the law." *Newman v. Massachusetts*, 884 F.2d 19, 26 (1st Cir.1989) (emphasis in the original), *cert. denied,* 493 U.S. 1078, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990).

Of particular relevance to our decision here is the recognition that the determination of a claim of qualified immunity is "independent of the merit of the underlying constitutional claim." *Morales v. Ramirez*, 906 F.2d at 787.

'Because qualified immunity does not address the substantive viability of [the asserted] claim, but rather the objective reasonableness of a defendant's actions, a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity.'

*Id.* (quoting *Collins v. Marina–Martinez*, 894 F.2d 474, 478 (1st Cir.1990)). That is to say that, even if the defendants in fact violated the plaintiff's Fourth Amendment right to be free from an unreasonable search when female correctional officers supervised and/or observed him during a visual body cavity search, if it was objec-

tively reasonable for the defendants to conclude that conducting such a search in the existing circumstances was lawful, these defendants are entitled to summary judgment based on qualified immunity. A reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not subject a government official to personal liability.

We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. [Citation omitted.] The same is true of their conclusions regarding exigent circumstances.

*Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039–3040; *see also Newman v. Massachusetts*, 884 F.2d at 27 ("even if it ultimately can be shown that the decision to censure her was arbitrary [ ] defendants are entitled to immunity from damages so long as they had no reason to know that the evidence on which they relied was faulty").

Our review of a denial of summary judgment based on qualified immunity is plenary. *Morales v. Ramirez*, 906 F.2d at 785. We, like the district court, " 'are obliged to examine the properly documented portions of the record and draw all reasonable inferences therefrom in the light most hospitable to the party opposing the motion.' " *Id.* (quoting *Amsden v. Moran*, 904 F.2d at 752).[4] "[W]e must examine the discovered facts regarding defendants' conduct relevant to the immunity claim and, applying normal summary judgment principles, determine whether a genuine issue does or does not exist concerning qualified immunity." *Unwin v. Campbell*, 863 F.2d 124, 132 (1st Cir.1988). "The question before us [is] whether, in light of those materials, the district court erred in finding a genuine issue of material fact as to defendants'

---

**4.** In this case, what the district court had before it, and what we also examine, includes the complaint, the defendants' motion for summary judgment and memorandum in support thereof, an affidavit of defendant Ash, the plaintiff's objection to the motion, interrogatories propounded to defendant Lyden, and a deposition of the plaintiff.

entitlement to qualified immunity." *Id.* at 128.

## II.

We now turn to an examination of the facts, crediting the plaintiff's version of disputed facts which are appropriately supported by the record, and construing all reasonable inferences in favor of the plaintiff. *See Amsden v. Moran,* 904 F.2d at 752–53.

On October 23, 1987, the plaintiff was assigned to the Medium South Unit (the Unit) of the New Hampshire State Prison. The Unit is comprised of three tiers, each consisting of four "pods." A pod houses between 10 and 20 inmates. The plaintiff was assigned to Pod 1C.

At approximately 3:00 p.m., on that day, inmates in the Unit began throwing trash and yelling. The tumult subsided enough so that, approximately one hour later, the prison officials were able to lock the inmates in their pods and get an accurate count. Although normally the Unit would be released, en masse, for supper in the dining room, because of the earlier disturbance, that evening the inmates were released for supper and fed, one tier at a time. When Pod 1C was released, the plaintiff went to his work assignment in the prison kitchen.

At approximately 7:00 p.m., when the inmates had returned to the Unit after supper and had been locked in their pods, the disturbance resumed, with greater intensity. The inmates destroyed furniture, smashed windows and lighting fixtures, and started fires. The prison staff were ordered to leave the pod area and go to the Unit's Control Room.

The plaintiff was not present in the Unit at this time, having remained at his work assignment in the prison kitchen. At approximately 7:15 p.m., the plaintiff was released from his work assignment and, at the direction of the Control Room officer, he returned to Pod 1C. The plaintiff describes his pod at that time as "in the middle of a riot situation." The plaintiff locked himself in his cell.

The disturbance continued for the next four hours. According to the plaintiff: "Inmates continued to yell in a hostile manner, trash was thrown out of Pods, picnic tables, sheets, plastic mop buckets, and other flammable materials were set on fire, etc...." Approximately 100 inmates were involved. The inmates in Pods 1B and 1C were the most heavily involved. The plaintiff remained in his cell, watching television and playing cards with his cellmate. He came out twice during the course of this four-hour period to use the toilet facilities.

At approximately 11:15 p.m., "dozens" of correctional personnel, including defendant Major Ash, entered the pod area. The "vast majority" were dressed in riot gear, including helmets, gas masks, and flak jackets, and were armed with shotguns, rifles, and tear gas weapons. Defendant Ash, using a bullhorn, ordered the inmates in Pod 1B to come out of their pod. They did not comply. Tear gas was fired into Pod 1B. The prison staff then entered that pod and removed all inmates. They were escorted to an unused section of the prison, known as the old cell block.

At approximately 11:45 p.m., defendant Ash and the other riot-clad staff returned to Pod 1C. Defendant Ash, again using the bullhorn, notified the inmates in Pod 1C that they had two minutes to leave the pod with their hands on their heads. The inmates in Pod 1C, including the plaintiff, complied. The inmates were then handcuffed and each was escorted by two correctional officers to the old cell block.

At the old cell block, each inmate was subjected to a visual body cavity search. As was the case with each inmate, the plaintiff had to remove every item of clothing, open his mouth, run his fingers through his hair, turn and show the bottoms of his feet, lift his genitals, and bend over to spread his buttocks.[5] This search

---

**5.** Although the parties and the district court, at times, referred to the search conducted as a "strip search," a more accurate description of the type of search conducted is a "visual body cavity search" and that is the term we will use.

was conducted by a male correctional officer, but the officer did not touch the plaintiff. The manipulation of body parts was done by the plaintiff. Two such searches were conducted simultaneously, i.e., two male correctional officers conducted these searches, each visually searching different inmates, who were positioned side-by-side against a wall.

Defendant Lieutenant Janet Lyden was responsible for supervising the entire old cell block operation, including the visual body cavity searches. The two officers conducting the searches were approximately three feet behind the inmates. Defendant Lyden was positioned between, and approximately two feet behind, the two officers conducting the searches, i.e., approximately five feet from the inmates as they were searched. The inmates, who were, as yet, unsearched, waited in a line approximately ten feet from where the searches were being conducted. Each of these waiting inmates remained handcuffed and between two escorting officers. Defendant Lyden periodically would say: "Next two inmates for the search" or "Okay, this man can be taken upstairs." The plaintiff estimated that the search lasted ten to fifteen minutes, most of that time spent by the searching officer making a thorough investigation of the removed clothing.

In the course of his search, the plaintiff at times faced defendant Lyden and she made eye contact with him. She was not staring at him, but appeared to be watching the inmates to make sure the officers did not miss anything during the search. The plaintiff does not recall that defendant Lyden said anything to him.

There were also four other female correctional officers present in the old cell block. One female officer was escorting inmates from the pods to the old cell block. Two others were on the third tier, 20 to 30 feet above the entire area. (The searches were being conducted on the first floor level.) These officers opened doors and escorted inmates, who had been searched and brought upstairs, to cells. The fourth female officer was standing near the old cell block door, approximately 15 to 30 feet away from where the searches were being conducted. The plaintiff alleges that the area where the visual body cavity searches were conducted was within the visual vantage point of these female officers, although he does not know if any of them saw him being searched. None of them ever made any comment to him about the search.

The plaintiff's estimate as to the number of male correctional staff officers present varied from "30" (in his deposition at p. 69) to "35 to 45" (in his deposition at p. 59) to "approximately 80" (in his complaint). At the time that the visual body cavity searches were being done, the plaintiff estimates that perhaps five of these men (non-ranking officers, he believes) were not doing anything. He speculates: "The officers were standing around probably because the inmates were being unhandcuffed two at a time and were unsecured. I imagine they were standing around to give some type of security to make sure they didn't run anywhere, do anything." Deposition at pp. 62–63.[6] Defendant Captain Metalious, who out-ranked defendant Lieutenant Lyden, was escorting inmates from the pods to the old cell block. Some of the prison administrators were also present in the old cell block at various times during the transfer process.

### III.

As the district court correctly noted, at the time of the search involved here, October 23, 1987, it was well established that "convicted prisoners do not forfeit all con-

---

A 'strip search,' though an umbrella term. generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A 'visual body cavity search' extends to visual inspection of the anal and genital areas. A 'manual body cavity search' includes some degree of touching or probing of body cavities.

*Blackburn v. Snow,* 771 F.2d 556, 561 n. 3 (1st Cir.1985).

6. Later in his deposition, the plaintiff stated that there were "a dozen that were just hanging around it appeared. They could have been there just to maintain a presence of security." Deposition at p. 87.

stitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). And, by that time, we had joined with all the courts, which had considered Fourth Amendment challenges to prison practices, in concluding that some Fourth Amendment protection was available to inmates as to their persons.. *Bonitz v. Fair,* 804 F.2d 164, 171 (1st Cir.1986), *overruled in part, on other grounds, by Unwin v. Campbell,* 863 F.2d 124, 132 (1st Cir.1988). We had recognized that a "severe if not gross interference with a person's privacy [ ] occurs when guards conduct a visual inspection of body cavities." *Arruda v. Fair,* 710 F.2d 886, 887 (1st Cir.), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983). · By that time, it was clearly established that body cavity searches had to be reasonable. *Bonitz v. Fair,* 804 F.2d at 172.

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884.

The plaintiff does not allege that it was unreasonable to conduct a visual body cavity search at all.[7] Nor does he allege that the manner in which it was conducted (other than it was under the supervision and/or within the vision range of female officers), was any different from any other of the "numerous" visual body cavity searches he had undergone. Deposition at pp. 40; 42; 46. We, therefore, focus on the law, as it existed as of October 23, 1987, with respect to such searches being supervised and/or observed by members of the opposite sex.

Certainly by the time of this search in 1987, the trend, if not the clearly established law, was that an inmate's constitutional right to privacy is violated when guards of the opposite sex regularly observe him/her engaged in personal activities, such as undressing, showering, and using the toilet. *Cumbey v. Meachum,* 684 F.2d 712, 714 (10th Cir.1982) (listing cases and concluding that such a claim may not be dismissed, sua sponte, as frivolous, pursuant to 28 U.S.C. § 1915(d)); *Bowling v. Enomoto,* 514 F.Supp. 201, 204 (N.D.Cal. 1981); *Hudson v. Goodlander,* 494 F.Supp. 890, 893 (D.Md.1980). It was acknowledged, however, that during times of emergency, such as

> when unrest breaks out among the inmates ... the officers in the affected areas require the assistance of officers stationed elsewhere. In such cases, it appears to be eminently reasonable that the nearest officers should be able to render assistance, regardless of their sex. Any temporary violation of inmate privacy that might occur would be justified by the over-riding necessity to pro-

---

**7.** To the extent that his claim that "the entire action violated his constitutional rights" is intended to assert the unlawfulness of a visual body cavity search at all in these circumstances, we believe, in any event, such a claim to be unsupported by caselaw. *See e.g., Bell v. Wolfish,* 441 U.S. at 560, 99 S.Ct. at 1885 (probable cause is not always required for a visual body cavity search); *Arruda v. Fair,* 710 F.2d at 886 (visual body cavity searches routinely conducted when inmates enter or leave their housing unit on their way to or from the prison law library and infirmary, and after they receive visitors in the unit's visiting rooms, do not violate the Fourth Amendment). We are mindful of the Court's remonstrance that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. at 547, 99 S.Ct. at 1878. In view of the tumult which the prison officials were responding to, the searches conducted to ensure that the inmates were not carrying weapons, matches, combustibles or other contraband appear reasonable.

In any event, since we have determined that the defendants were entitled to qualified immunity, i.e., it was objectively reasonable for them to conclude that it was lawful in these circumstances for female correctional officers to supervise and/or observe these searches, *a fortiori,* these defendants would be entitled to qualified immunity for their actions in conducting such searches at all.

tect the safety of both inmates and officers.

*Hudson v. Goodlander,* 494 F.Supp. at 894; *see also Bowling v. Enomoto,* 514 F.Supp. at 204 (emergency conditions, not shown in that case, might warrant unrestricted opportunities for female officers to inspect male inmates).

Concomitantly, courts were holding that, even assuming such a protected right, inadvertent and occasional observations, or casual observations restricted by distance, of inmates dressing, showering, being strip searched or using toilet facilities do not rise to the level of constitutional infringement. *Grummett v. Rushen,* 779 F.2d 491 (9th Cir.1985); *Smith v. Chrans,* 629 F.Supp. 606 (C.D.Ill.1986);[8] *see also Avery v. Perrin,* 473 F.Supp. 90 (D.N.H.1979) (there is only a *de minimis* invasion of an inmate's privacy right by regular delivery of mail by a female clerk, when the time of delivery never deviates more than one or two minutes and, thus, the inmate can easily anticipate her appearance and regulate his daily routine); *cf. Bonitz v. Fair,* 804 F.2d at 173 ("a body-cavity search of female inmates conducted by police officers, involving touching, conducted in a non-hygienic manner and in the presence of male officers, was a clearly established violation of the inmates' fourth amendment right to be free from an unreasonable search").

From the preceding, we, therefore, summarize the state of the relevant law in October 1987 to have been that (1) inadvertent, occasional, casual, and/or restricted observations of an inmate's naked body by a guard of the opposite sex did not violate the Fourth Amendment and (2) if the observation was other than inadvertent, occasional, casual, and/or restricted, such observation would (in all likelihood) violate the Fourth Amendment, *except* in an emergency condition.

## IV.

The district court, in denying the defendants' motion for summary judgment, con-

cluded that there remained a material factual issue: whether or not an emergency situation existed in the prison at the time the visual body cavity search was conducted. It believed that the evidence in the record of the presence of other senior male officers (who might have supervised the searches) may be evidence that "the presence of female officers in the search area was an 'exaggerated response' by prison officials to unfounded security concerns." *See Turner v. Safley,* 482 U.S. 78, 90, 107 S.Ct. 2254, 2262, 96 L.Ed.2d 64 (1987) (the existence of obvious, easy alternatives may be evidence that a prison regulation is not reasonable, but is an "exaggerated response" to prison concerns). By the same reasoning, the court concluded that it was premature to determine whether the defendants are entitled to qualified immunity.

The defendants, on appeal, argue that the merits of the Fourth Amendment claim is "inexorably intertwined" with the issue of qualified immunity such that we should "review the merits of the question directly, applying Rule 56 criteria, to determine whether plaintiff has made out a claim of constitutional breach at all." *Morales v. Ramirez,* 906 F.2d at 787–88. And, the defendants contend, applying the *Turner* Court's analysis, this search was reasonably related to legitimate penological objectives and thus constitutional.

We do not find it necessary to determine definitively the merits of this Fourth Amendment claim, for we conclude that even assuming that, in fact, this search violated the plaintiff's constitutional rights, it was objectively reasonable for the defendants to conclude that having female correctional officers supervise and/or observe this search in these circumstances was lawful and thus they are entitled to qualified immunity. The district court's analysis failed to address this critical focus as to qualified immunity. It found a triable factual issue as to the existence of an emergency condition. It concluded that this outstanding issue precluded summary judg-

---

8. *See also* (post–1987 cases) *Timm v. Gunter,* 917 F.2d 1093, 1101–02 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991); *Michenfelder v. Sumner,* 860 F.2d 328, 333–34 (9th Cir.1988); *Valdez v. Farmon,* 766 F.Supp. 1529, 1535 (E.D.Cal.1991).

ment in the defendants' favor and made any determination of the defendants' qualified immunity premature. However, even assuming, as the district court concluded, the existence of this material fact precluded summary judgment in the defendants' favor *on the merits* of the claim, the focus of qualified immunity is on what a reasonable official would have known with respect to his conduct in these circumstances. And, we conclude, from an examination of the record materials, and drawing all reasonable inferences therefrom in the plaintiff's favor, that there is no "genuine issue of material fact as to defendants' entitlement to qualified immunity." *Unwin v. Campbell*, 863 F.2d at 128.

## V.

It is undisputed (and the record bears out) that, at least at some point in time, on the afternoon and evening of October 23, 1987, there was an emergency situation in the prison's Medium South Unit. Even the plaintiff characterized the tumult as a "riot." The point in time significant to this appeal, of course, is that time in which the visual body cavity searches were conducted. The caselaw supports the conclusion that, in an emergency situation, a visual body cavity search conducted within the view of a guard of the opposite sex, even if other than an inadvertent and/or restricted view, would not violate an inmate's Fourth Amendment right. *See supra*, at 446–447.

In plaintiff's view, the emergency was over because the guards were in control; the inmates were far outnumbered and were handcuffed (except during the search) and being escorted, during the transfer to the old cell block, by at least one, if not two, guards. The plaintiff opines that any of the other male guards or, at least, one of the male guards of superior ranking to Lieutenant Lyden, could have supervised the search. He contends that no emergency situation existed in the old cell block area warranting the presence of *any* female officers during the visual body cavity searches.[9]

The duration of an "emergency," however, is not always (and perhaps not often), it would seem, marked with bright lines of demarcation. And, what we must bear in mind in reviewing a claim of qualified immunity, is that "[d]efendants are liable for damages only if they *should have known* that *what they did* violated the law." *Newman v. Massachusetts*, 884 F.2d at 26.[10] At what point an emergency has ended, rather than capable of pinpoint reference, is more likely determined by place-

---

**9.** We point out that, even absent an emergency situation, the clearly established law at this time held that inadvertent observations, or casual observations restricted by distance, of a naked inmate did not violate that inmate's Fourth Amendment right. *See supra*, at 446–447. Aside from defendant Lyden, and perhaps the unidentified female officer escorting inmates to the old cell block area, the positions of the other female officers in the old cell block area suggest that any observations they may have had were inadvertent and/or restricted by distance. More importantly, the plaintiff cannot state that, in fact, any of these officers, other than defendant Lyden, *actually* saw him.

**10.** While it may have been clearly established that there is no Fourth Amendment violation if the observation, by a guard of the opposite sex, of a visual body cavity search occurs during an emergency situation, there was (and is) a dearth of caselaw as to what constitutes such an emergency. *See Michenfelder v. Sumner*, 860 F.2d at 330 (female officers do not *conduct* strip searches except in severe emergencies [not otherwise described] ) (emphasis added); *Grummett v. Rushen*, 779 F.2d at 495 ("the record indicates that only in two or three emergency situations [not otherwise described] have female guards observed unclothed body searches.... We cannot conclude, on this record, that the observations by the female officers were not justified by emergent circumstances"); *Lee v. Downs*, 641 F.2d 1117, 1120–21 (4th Cir.1981) (search of inmate's vagina by a female nurse in the presence of two male guards was justified by necessity; inmate was big and strong and her conduct had been bizarre; she had removed her paper dress, wound an electrical cord around her neck, then set her paper dress afire and was dancing naked around the burning dress, clapping her hands; there was testimony that a number of female guards could not be withdrawn from their established posts within any reasonable period of time); *cf. Merritt–Bey v. Salts*, 747 F.Supp. 536 (E.D.Mo.1990) (the presence of a female officer, who stood guard at the inside of the cell door, while a male officer conducted a visual body cavity search of an inmate who had committed two conduct violations (a verbal assault of an officer during a routine patdown search and possession of contraband (a mechanical pencil)) within a span of about 15 minutes did not violate inmate's

ment somewhere on a continuum of time. Here, the facts are that the inmates' riotous behavior had ended as a result of the defendants' show of force and this search was conducted as part of a transfer of inmates in response to their riotous behavior in order to ensure that the inmates were not carrying weapons, matches, combustibles or other contraband, which could cause a resumption of the disturbance. Unquestionably, there would be some point at the extreme end of this continuum of time at which a prison official could not reasonably believe that his conduct was occurring during the course of an emergency. *Hoitt v. Vitek*, 497 F.2d 598, 600 (1st Cir.1974) ("[t]he unreviewable discretion of prison authorities in what they deem to be an emergency is not open-ended or time unlimited"). We need not explore this outer reach, however, for we can confidently conclude that the defendants' judgment in this case about their conduct in the *immediate* aftermath of this riot (that is, even if a trier of fact were to find that the emergency, in fact, had ended) fell comfortably within this spectrum.[11]

The Supreme Court has said that a law enforcement official's reasonable, although mistaken, conclusion regarding the presence of "exigent circumstances" supporting a warrantless search does not subject that official to personal liability. *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039; *see also Vaughan v. Ricketts*, 859 F.2d 736, 739 (9th Cir.1988) (a defendant is entitled to summary judgment

granting him qualified immunity if he can establish that " 'a reasonable officer could have believed that the search comported with [the Constitution] even though it actually did not' " (quoting *Anderson, supra* )), *cert. denied*, 490 U.S. 1012, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989). We believe that determination applies no less to an official's reasonable, although mistaken, conclusion regarding the existence of an emergency permitting a visual body cavity search although conducted within the visual range of a prison guard of the opposite sex. We conclude, therefore, that the defendants are entitled to qualified immunity in this case.

*Reversed and remanded.*

---

Fourth Amendment's right), *aff'd,* 938 F.2d 187 (8th Cir.1991).

11. According to Major Ash's affidavit at ¶ 23, The assignment of correctional officers to particular duties during the disturbance was based on how best to allocate staff, taking into account availability, the hours already worked by staff, the needs of the prison and the experience and training of the officers. Gender was not a factor in the assignment of duties. A crisis situation existed at the prison. It would have taken valuable time and attention away from monitoring the disturbance to have to figure out how to assign female staff so as to avoid any possible exposure to unclothed male inmates. Given the number of staff available it might not even have been possible to make this allocation.

We are also mindful that "the central objective of prison administration [is] safeguarding

institutional security," *Bell v. Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878, and of "the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance," *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). "When the 'ever-present potential for violent confrontation and conflagration,' [citation omitted] ripens into *actual* unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,' [citation omitted] carries special weight." *Id.* at 321, 106 S.Ct. at 1085 (emphasis in the original). "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates." *Id.* at 322, 106 S.Ct. at 1085.