Opinion by Judge RAWLINSON; Partial Concurrence and Partial Dissent by Judge N.R. Smith.
OPINION
RAWLINSON, Circuit Judge:
Charles E. Byrd (Byrd), a pretrial detainee at the time, was subjected to a cross-gender strip search of his genital area. Because the strip search was unreasonable under the facts of this case, we reverse the district court’s entry of judgment in favor of Defendants-Appellees Maricopa County Sheriffs Department and then-cadet Kathleen O’Connell (O’Connell).

I. BACKGROUND

While Byrd was a pretrial detainee in a minimum-security facility, Maricopa County jail officials ordered a search of Byrd’s entire housing unit (approximately ninety inmates). It is undisputed that no emergency existed. Rather, the search was precipitated by the occurrence of several fights and a suspicion of contraband in the jail.
Maricopa County Special Response Team officers carrying pepper ball guns and tasers entered the facility. They ordered Byrd to remove all clothing except his boxer shorts, which were pink and made of a very thin material. Once the inmates in the housing unit formed a line, jail officials ordered four to six inmates at a time into the “day room,” a common area, to be searched. Cadets from the detention officer training academy searched the inmates with training supervisors present. The cadets wore jeans and white t-shirts with them last names printed on the back. They were not otherwise identified.[1] Approximately twenty-five to thirty cadets and ten to fifteen uniformed detention officers were present in the day room. However, none of the detention officers participated in the searches. At *1137 least one person videotaped the cadets’ search of the inmates.
Byrd was searched by a female cadet. He testified that, during the searches, male detention officers stood by watching. The record clearly reflects that only four inmates were searched at a time, by no means an overwhelming number.[2] Although no factual finding was made on this point by either the judge or the jury, contrary to the dissent, it was by no means “undisputed ... that the County did not have sufficient numbers of male detention officers to conduct searches of male inmates without the assistance of female officers.” Dissenting Opinion, p. 1151.
When Byrd entered the day room, the cadets were lined up and waiting. O’Connell ordered him to turn away from her, spread his feet and raise his arms above his head. Wearing latex rubber gloves, she pulled out Byrd’s waistband a few inches and felt the waistband to make sure nothing was hidden in it. O’Connell did not look inside Byrd’s boxer shorts.
Next, O’Connell placed one hand on Byrd’s lower back holding the back part of the boxer shorts and, with her other hand, searched over his boxer shorts, his outer thigh from his hip to the bottom of the shorts. She then moved her hand from his outer thigh to the bottom of the shorts on his inner thigh and applied slight pressure to feel his inner thigh for contraband. Using the back of her hand, O’Connell moved Byrd’s penis and scrotum out of the way applying slight pressure to search the area. O’Connell then searched the other side using the same technique.
Finally, O’Connell placed her hand at the bottom of Byrd’s buttocks and ran her hand up to separate the cheeks while applying slight pressure, to search for contraband inside his anus. O’Connell estimated that the search lasted ten to twenty seconds, and Byrd estimated that the search took sixty seconds. After the search was completed, Byrd was directed to go to the opposite end of the day room, and sit facing the wall.
On the day of the search, Byrd filed an inmate grievance complaining that O’Connell “grab[bed] [his] balls and [his] scrotum.” Byrd filed three additional inmate grievances to no avail. Byrd subsequently filed a pro se complaint naming Maricopa County Sheriff Joseph Arpaio (Arpaio), O’Connell, and Captain Austin Peterson (Peterson) as defendants. The complaint alleged that the search violated Byrd’s right under the Fourth Amendment to be free from unreasonable searches, and Byrd’s rights under the Fourteenth Amendment to equal protection of the laws and substantive due process protection to be free from punishment.[3]
The district court dismissed Byrd’s equal protection claim but denied Maricopa County’s motion for summary judgment *1138 on Byrd’s Fourth Amendment unreasonable search claim and his Fourteenth Amendment substantive due process claims. The court also appointed counsel to represent Byrd at trial.
Following the presentation of evidence, the district court granted judgment as a matter of law in favor of Peterson, O’Connell’s supervisor, on the premise that Peterson was not connected to the search. Byrd does not challenge this ruling on appeal.
Additionally, the district court granted judgment as a matter of law in favor of Arpaio, finding that Byrd presented no evidence that Arpaio had instituted an unconstitutional policy or had personally participated in the search. The court also ruled as a matter of law that the search was constitutionally valid. Thus, with O’Connell as the only defendant, the district court narrowed the issues to be presented to the jury to these three:[4] (1) whether “O’Connell deprived [Byrd] of his right against unreasonable search by intentionally squeezing or kneading his penis or scrotum or improperly touching his anus through his underwear;” (2) whether “O’Connell deprived [Byrd] of due process of law” by “intentionally squeezing] or knead[ing] [Byrd’s] penis or scrotum or improperly touching] his anus through his underwear,” with “[O’Connell’s] actions inflicting] [wanton] pain on [Byrd];” and (3) whether “O’Connell deprived [Byrd] of his right against unreasonable search by conducting a search not done for [an] identified security need.”[5]
The district court’s formulation of these three issues for the jury’s consideration completely eliminated the jury’s contemplation of whether the cross-gender strip search violated Byrd’s right under the Fourth Amendment to be free from unreasonable search. Instead, the district court’s formulation of the factual issues presented to the jury limited the determination of reasonableness under the Fourth Amendment to whether O’Connell “intentionally squeezed or kneaded [Byrd’s] penis or scrotum or improperly touched his anus through his underwear.” The jury found in favor of O’Connell on all counts.
In Byrd v. Maricopa County Sheriff’s Dep’t, 565 F.3d 1205 (9th Cir.2009), a divided panel of this court affirmed the district court’s judgment. We subsequently granted rehearing en banc, 583 F.3d 673 (9th Cir.2009).

II. STANDARD OF REVIEW

We review an order granting or denying judgment as a matter of law de novo. See Mangum v. Action Collection Serv., Inc., 575 F.3d 935, 938 (9th Cir.2009). “Judgment as a matter of law is appropriate when the evidence presented at trial permits only one reasonable conclusion. That is, a motion for judgment as a matter of law is properly granted only if no reasonable juror could find in the non-moving party’s favor.” Id. at 938-39 (citations, alteration, and internal quotation marks omitted).

*1139
III. DISCUSSION

A. Substantive Due Process and Equal Protection Claims
Byrd did not strenuously press his substantive due process and equal protection claims during the en banc argument. In fact, Byrd’s counsel candidly acknowledged that there was “a basis” for the panel’s affirmance of the district court’s decision to dismiss Byrd’s equal protection claim for failure to state a claim. We review this basis for dismissal de novo, and may affirm the dismissal for any reason supported by the record. See Thompson v. Paul, 547 F.3d 1055, 1058-59 (9th Cir.2008).
A peripheral equal protection issue was in the air because of the text of Maricopa County’s Contraband Control Policy (Contraband Policy) distinguishing between male and female inmates when a frisk search is involved. According to the Contraband Policy, “[m]ale inmates may be frisk searched by either male or female offieers[,]” but “[flemale inmates will only be searched by female officers, absent exigent circumstances.” However, there are two considerations that counsel against delving too deeply into the equal protection issue. The first is Byrd’s concession of “a basis” for the ultimate dismissal of his equal protection claim. The second is the lack of a factual record to properly analyze the equal protection claim.
It is important to note that Byrd did not challenge the Contraband Policy on which Maricopa County relied in its opposition to Byrd’s claims. Rather, Byrd’s equal protection claim was couched generally in terms of the treatment of male inmates, without reference to the policy. In any event, the Contraband Policy does not establish the reasonableness of the search. The Contraband Policy expressly provides that “[s]trip searches will be conducted by an officer of the same sex as the inmate .... ” Under the Contraband Policy a strip search is defined as a “visual scan of the inmate’s skin after all clothing has been removed.” Maricopa County seizes on this definition to argue that the search performed on Byrd was not a strip search because Byrd was wearing very thin boxer shorts. Rather, Maricopa County maintains that Byrd was subjected to a frisk search.
The Contraband Policy defines a frisk search as “[cjarefully examining an inmate by inspecting his clothing, and feeling the contours of his clothed body ...” (emphasis added). The Contraband Policy provides that “[t]he inmate’s shoes and socks may be removed ...” However, no mention is made of the removal of other clothing as part of a frisk search. In sum, the search was not properly conducted as a strip search under the Contraband Policy because it was not conducted by staff of the same gender, and it was not limited to a visual inspection of Byrd’s body. The search was not properly conducted as a frisk search under the Contraband Policy because Byrd was not clothed as contemplated in the policy. The particular search conducted in this case simply does not fall within the contours of the Contraband Policy. Therefore, no basis exists for concluding that the provisions of the Contraband Policy defeat Byrd’s equal protection claim.
The district court dismissed Byrd’s equal protection claim as one premised on the disparate treatment of prisoners and found, without acknowledging the gender element, that prisoners are not a suspect class. However, given the existence of a facially discriminatory contraband policy, an equal protection claim based on the disparate treatment of male and female prisoners was viable. See Wyatt v. Terhune, 315 F.3d 1108, 1111-12 (9th Cir.2003) (acknowledging a male inmate’s equal protection claim based on prison grooming regulations that did not apply to female inmates); Jeldness v. Pearce, 30 *1140 F.3d 1220, 1231 (9th Cir.1994) (recognizing disparate treatment of male and female prisoners, but declining to reach the equal protection question); Roubideaux v. N.D. Dep’t of Corr. & Rehab., 570 F.3d 966, 974 (8th Cir.2009) (applying heightened review standard to statutes containing a “gender-based classification on their face”); Pitts v. Thornburgh, 866 F.2d 1450, 1453 (D.C.Cir.1989) (same for prison policies).
Although the Contraband Policy was part of the record before the district court, Byrd’s complaint made no reference to it and his equal protection allegation largely repeated the facts that formed the basis of his other claims. Even construing Byrd’s pro se complaint liberally, the allegations failed to state an equal protection claim because they asserted only allegedly harmful treatment and mentioned nothing about disparate treatment, much less about the specific jail policy or gender classification in general. See Weilburg v. Shapiro, 488 F.3d 1202, 1205 (9th Cir.2007) (“Pro se complaints are to be construed liberally ...”); see also Pena v. Gardner, 976 F.2d 469, 471 (9th Cir.1992) as amended (noting that “a liberal interpretation of a pro se civil rights complaint may not supply essential elements of the claim that were not initially pled ...”). For that reason, we do not take issue with the ultimate ruling dismissing Byrd’s equal protection claim.
As for the substantive due process claim, Byrd failed to allege or produce evidence that O’Connell or Arpaio expressed an intent to punish Byrd or that the search was unrelated to a “legitimate governmental objective.” Bell, 441 U.S. at 538-39, 99 S.Ct. 1861 (explaining that the critical inquiry is “whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word” and that, “if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment”) (footnote reference and internal quotation marks omitted).
In the alternative, punitive intent may be inferred. See id. (“[I]f a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.” (citation and footnote omitted)). It is undisputed that the search in this case was prompted by several recent fights and suspicion of contraband. Because a search premised on such security concerns is reasonably related to legitimate goals of detention officials, see, e.g., Michenfelder v. Sumner, 860 F.2d 328, 333 (9th Cir.1988), no basis exists to draw an inference of intent to punish Byrd. In the absence of evidence of an intent to punish, or evidence that Maricopa’s actions were unrelated to a “legitimate governmental objective,” the district court properly granted judgment as a matter of law in favor of O’Connell and Arpaio on Byrd’s Fourteenth Amendment substantive due process claim. Bell, 441 U.S. at 539 n. 20, 99 S.Ct. 1861 (“[I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective.”) (citations omitted).
B. Unreasonable Search and Seizure
The district court granted judgment as a matter of law in favor of O’Connell on the issue of whether the cross-gender strip search violated Byrd’s right under the Fourth Amendment to be free from unreasonable searches. We review this decision de novo, keeping in mind that “[jjudgment as a matter of law is appropriate when the evidence presented at trial *1141 presents only one reasonable conclusion ...” Mangum, 575 F.3d at 938 (citation and internal quotation marks omitted). In the context of this case, judgment as a matter of law would be appropriate only if the evidence presented at trial led inevitably to the conclusion that the cross-gender strip search was reasonable. Whether a search is reasonable under the Fourth Amendment requires a case-by-case “balancing of the need for the particular search against the invasion of personal rights that the search entails ...” Bell, 441 U.S. at 559, 99 S.Ct. 1861. The required factors for courts to consider include: (1) “the scope of the particular intrusion,” (2) “the manner in which it is conducted,” (3) “the justification for initiating it,” and (4) “the place in which it is conducted.” Id. (citations omitted).[6]
We approach this issue by reiterating our longstanding recognition that “[t]he desire to shield one’s unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.” York v. Story, 324 F.2d 450, 455 (9th Cir.1963); see also Michenfelder, 860 F.2d at 333 (same); Grummett v. Rushen, 779 F.2d 491, 496 (9th Cir.1985) (distinguishing cross-gender searches that “are done briefly and while the inmates are fully clothed, and thus do not involve intimate contact with the inmates’ bodies ”) (emphasis added). It is not surprising that a connection has been made between cross-gender searches and the level of sexual impropriety between inmates and corrections personnel. See, e.g., Nicholas D. Kristof, Op-Ed., Kids in Crisis (Behind Bars), N.Y. TIMES, Jan. 28, 2010, at A33 (discussing a “stunning new Justice Department special report” finding that cross-gender assignments in prisons foster abuse of inmates by male and female officers); Connie Rice and Pat Nolan, Op-Ed, Policing Prisons, L.A. Times, Apr. 5, 2010, at A13 (citing to the June, 2009, National Prison Rape Elimination Commission Report (Commission Report)).
In the preface to the Commission Report, The Honorable Reggie B. Walton, Chair of the Commission, noted that the Commission was “challenged to examine problems that we wish did not exist and confronted with accounts of sexual abuse that shocked and saddened us ...” Commission Report at vi. The Commission explicitly recognized that “searches carried out by staff of the opposite gender heighten the potential for abuse____ In the Commission’s view, the risks are present whether the officers are male or female.” Id. at 62 (footnote reference omitted).[7]
Although the Commission acknowledged that cross-gender supervision “can have *1142 benefits,” it nevertheless determined that “[t]o prevent abuse, ... the standard on this subject strictly prohibits non-medical staff from conducting cross-gender strip and visual body cavity searches — except in the case of emergency — because of their extraordinarily intrusive nature.” Id. at 63.
The Commission’s findings are consistent with the standards adopted by the American Correctional Association, the accrediting body for adult correctional facilities. See Standards For Adult Correctional Institutions (2003).
Section 4-4194 addresses cross-gender strip searches, articulating the standard as follows:
Written policy, procedure and practice provide that, except in emergency situations, visual inspections of inmate body cavities are conducted by officers of the same sex, in private ...
Id. at 53.
Applying the Bell factors in the context of our precedent recognizing the privacy interest of inmates in their personal dignity, giving credence to the compelling findings made by the Commission, and acknowledging the applicable accrediting standards, we conclude that the cross-gender strip search of Byrd was unreasonable as a matter of law. O’Connell touched Byrd’s inner and outer thighs, buttocks, and genital area with her latex-gloved hand through very thin boxer shorts. She moved his penis and scrotum in the process of conducting the search. The scope of this intrusion totally thwarted any desire on Byrd’s part to “shield[his] unclothed figure from [the] view of strangers ... of the opposite sex ...” York, 324 F.2d at 455. The scope of the intrusion in this case far exceeds searches we have previously sanctioned and weighs in favor of a finding of unreasonableness.
In Grummett, 779 F.2d at 493, 495, we upheld a system of assigning female officers within a correctional facility such that they occasionally viewed male inmates in various states of undress and regularly conducted routine pat-down searches of inmates that did not involve intimate contact with the inmate’s body. We expressly noted that “female officers [were] not assigned positions in which they conduct or observe strip or body cavity searches.” Id. at 495 (emphases added). Although the dissent characterizes the search of Byrd as a pat-down search, see Dissenting Opinion, p. 1152, we offered a different description of a pat-down search in Grummett. There, we defined pat-down searches as searches “done briefly and while the inmates are fully clothed, and thus do not involve intimate contact with the inmates’ bodies.” Grummett, 779 F.2d at 496. In contrast, Byrd was barely clothed at all, and it is undisputed that the female officer twice touched Byrd’s penis and scrotum, and searched inside his anus.
In Michenfelder, 860 F.2d at 334, we reiterated that “infrequent and casual observation, or observation at [a] distance, ... are not so degrading as to warrant court interference” (citing Grummett, 779 F.2d at 494-95) (parallel citations omitted). Our holding in Michenfelder offers no support for a cross-gender strip search. If the panel in Michenfelder intended to approve cross-gender strip searches, it would have distinguished Grummett, rather than citing the case in support of the panel’s ruling.
None of the other cases cited by our colleagues, see Dissenting Opinion, pp. 1150-51, purports to approve cross-gender strip searches in the absence of an emergency. Indeed, neither Bell, 441 U.S. at 559-60, 99 S.Ct. 1861; Rickman v. Avaniti 854 F.2d 327, 328 (9th Cir.1988); nor Thompson v. Souza, 111 F.3d 694, 700 (9th Cir.1997), involved cross-gender strip searches, the issue we address in this case.
*1143 The manner in which the search was conducted weighs in favor of a determination of unreasonableness. Byrd was searched by a female cadet who was dressed in jeans and a white t-shirt. Other than the name printed on the back of the t-shirt, the officer who conducted Byrd’s search was unidentified. Ten to fifteen non-participating officers watched the strip search, and at least one person videotaped the search. Although the dissent relies on the fact that the search was conducted “professionally,” see Dissenting Opinion, pp. 1150-51, we have consistently recognized the “ ‘frightening and humiliating’ invasion” occasioned by a strip search, “even when conducted ‘with all due courtesy.’ ” Way, 445 F.3d at 1160, quoting Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir.1984) (per curiam). Furthermore, the dissent’s reliance on the jury’s finding that the manner of O’Connell’s search was appropriate because O’Connell “did not intentionally squeeze or knead Byrd’s penis or scrotum or improperly touch his anus through his boxer shorts,” Dissenting Opinion, p. 1151, ignores the district court’s ruling that the cross-gender aspect of the search was constitutional as a matter of law. Thus, the jury was not deciding whether the manner of the search was appropriate despite being performed by a member of the opposite sex.
The justification for conducting the search weighs in favor of a determination of reasonableness. It is undisputed that the search was initiated due to several recent fights and suspicion of contraband. These circumstances constituted valid reasons to search the inmates, even though no immediate emergency existed. See Thompson, 111 F.3d at 700 (noting that the purpose of the search was to “detect illicit drugs”); see also Michenfelder, 860 F.2d at 332-33 (recognizing that a search for contraband constitutes adequate justification). Nevertheless, although valid reasons to search the inmates existed generally, there was no justification given for conducting a cross-gender strip search. The dissent glosses over this distinction when emphasizing the jury’s finding that there were valid reasons to search the inmates. See Dissenting Opinion, pp. 1149-50. The jury had been specifically instructed not to consider the cross-gender element of the search, and therefore the jury’s finding that a search was justified does not amount to a finding that a search by a woman was justified.
The final Bell factor, the place of the search, similarly weighs in favor of a finding of reasonableness. Byrd was searched in the day room, a common area. Other inmates were present, making it less likely that improper conduct would occur. See Thompson, 111 F.3d at 701 (upholding visual strip search of inmate that took place on the tier just outside the inmate’s cell within view of other prisoners).
Although the last two factors weigh in favor of a determination of reasonableness, the effect of the first two factors is so extreme that a conclusion of unreasonableness is compelled. Courts throughout the country have universally frowned upon cross-gender strip searches in the absence of an emergency or exigent circumstances.[8]
*1144 In Cookish v. Powell, 945 F.2d 441, 442 (1st Cir.1991) (per curiam), the First Circuit resolved a civil rights complaint alleging that prison officials violated an inmate’s right under the Fourth Amendment to be free from unreasonable searches. The inmate’s claim was predicated on the fact that “female correctional officers supervised and/or observed him during a visual body cavity search.” Id. (footnote reference omitted). It was undisputed that the search occurred during “an emergency situation.” Id. at 448. Plaintiff himself described the prison conditions as a “riot.” Id. at 444. Understandably, prison officials commenced visual body cavity searches of inmates “to ensure that the inmates were not carrying weapons, matches, combustibles or other contraband ...” Id. at 446 n. 7. As in this case, the Plaintiff did not challenge the reasonableness of the search per se or the manner in which the search was conducted. See id. at 446. Rather, similar to Byrd, the Plaintiff in Cookish asserted a violation of his constitutional rights primarily because a female lieutenant was involved, supervising the visual body cavity search from approximately five feet away. See id. at 445.
The First Circuit reiterated its recognition “that a severe if not gross interference with a person’s privacy occurs when guards conduct a visual inspection of body cavities.” Id. at 446 (citation, alteration and internal quotation marks omitted). The court also explained that:
Certainly by the time of this search in 1987, the trend, if not the clearly established law, was that an inmate’s constitutional right to privacy is violated when guards of the opposite sex regularly observe him/her engaged in personal activities, such as undressing, showering and using the toilet.
Id. (citations omitted).
The First Circuit summarized the state of the law governing cross-gender searches as of late 1987:
(1) inadvertent, occasional, casual, and/or restricted observations of an inmate’s naked body by a guard of the opposite sex did not violate the Fourth Amendment and (2) if the observation was other than inadvertent, occasional, casual, and/or restricted, such observation would (in all likelihood) violate the Fourth Amendment, except in an emergency condition.
Id. at 447 (emphasis in the original).
In sum, almost twenty years ago, the First Circuit ruled, in no uncertain terms, that visual observation of a nude male by a female corrections officer “would (in all likelihood),” violate that inmate’s constitutional right to be free from unreasonable searches. Id. It is notable that, in determining that the officers involved were entitled to qualified immunity, the First Circuit focused on the emergency conditions surrounding the search. See id. at 448 *1145 (“The caselaw supports the conclusion that, in an emergency situation, a visual body cavity search conducted within the view of a guard of the opposite sex, even if other than an inadvertent and/or restricted view, would not violate an inmate’s Fourth Amendment right.”) (citation omitted) (emphasis added).
In 1981, the Fourth Circuit similarly recognized the inappropriateness of cross-gender strip searches. See Lee v. Downs, 641 F.2d 1117, 1120 (4th Cir.1981) (“[M]ales subject to frisk searches by female guards dming ivhich the genitals are touched and felt through clothing [are] entitled to injunctive relief.”) (citation omitted) (emphasis added). This description by the Fourth Circuit fits the facts of this case perfectly. The professionalism with which the search is conducted in no way changes the consistent depiction of a cross-gender strip search in the absence of an emergency as violative of Fourth Amendment principles.
In 1999, the Fifth Circuit decided that an inmate stated a valid Fourth Amendment claim when the inmate filed a civil rights action alleging “multiple strip and body cavity searches performed by a female officer ...” Moore v. Carwell, 168 F.3d 234, 235 (5th Cir.1999). In reaching its conclusion, the Fifth Circuit distinguished a prior case holding “that the mere presence of female officers during a strip search of prisoners during emergency circumstances did not violate the Fourth Amendment.” Id. at 236 (citation omitted) (emphases in the original). As with the other circuits, the Fifth Circuit considered the lack of an emergency a crucial factor in support of the existence of a constitutional violation stemming from a cross-gender strip search. The Fifth Circuit also considered the fact that male officers were present to conduct the search. See id. at 237.
In 1994, the Seventh Circuit decided Canedy v. Boardman, 16 F.3d 183 (7th Cir.1994). Canedy sued the corrections facility where he was housed, asserting that his privacy rights were violated when two female guards “strip searched him” “during a shakedown of his housing unit.” Id. at 184. Canedy also alleged that the violation could have readily been prevented due to the fact that ten male officers were nearby at the time. See id.
The district court dismissed Canedy’s Complaint for failure to state a claim. The district court determined that any privacy rights possessed by Canedy were outweighed by the prison’s interest in providing equal employment opportunities for female officers. The district court specifically ruled:
If female guards are to be given equal opportunity for employment and promotion, it is necessary to allow them to observe male prisoners and conduct searches just as male officers would. To exclude females from observing or participating in all aspects of guard work could prevent them from gaining the experience they need to advance to higher positions, and bar them from assuming those positions that require monitoring of inmate searches or other activities in which inmates are unclothed.
Id. (citation omitted).
As a preliminary matter, the Seventh Circuit acknowledged the general consensus that a strip search is “one of the clearest forms of degradation in Western Society ...” Id. at 185 (citation and alteration omitted). The Seventh Circuit also recognized that the indignity is multiplied when one’s body is exposed to a member of the opposite gender. See id. (referencing York, 324 F.2d at 455).
Against that background, the Seventh Circuit considered the invasion of the inmate’s privacy and the employment rights *1146 of the female corrections officers. Rather than agreeing that the employment rights of the female officers tramped the privacy rights of the inmates, the Seventh Circuit concluded that the privacy interests of the inmate must be recognized and accommodated. See id. at 187. One accommodation cited with approval by the Seventh Circuit was excluding the genital area when conducting cross-gender searches. See id.
The Seventh Circuit characterized Canedy’s complaint as one alleging that he was subjected to cross-gender strip searches without any effort to accommodate his privacy interests vis á vis the prison’s parallel interest in affording equal employment opportunities. See id. at 188. In reversing the dismissal of Canedy’s Complaint, the Seventh Circuit proclaimed that “[a]Imost every federal court that has addressed this issue has come to the conclusion that the Constitution demands such an accommodation [in the absence of an emergency]”. Id. at 187.
In 1995, the Tenth Circuit addressed the issue of cross-gender strip searches in Hayes v. Marriott, 70 F.3d 1144 (10th Cir.1995). Hayes alleged that a videotaped strip search conducted in the presence of, inter alia, female corrections officers violated his constitutional rights under the Fourth Amendment. See id. at 1145.
An administrative officer from the Colorado Department of Corrections (DOC) proffered the following justification for the presence of female staff:
There is no particular DOC policy relating to use of female staff during strip searches. As a matter of courtesy to the inmate population, male staff members are used whenever possible. There is no indication any female staff members conducted a strip search during the dates in question. Although every effort was made to reduce the number of female staff during the search, females are an essential part of our staffing. All posts still had to be covered and females did view parts of the search while conducting their normal duties or observation duties so male staff could conduct the searches. There was no justifiable reason to totally exclude female staff from this required function. Additionally, the total absence of female staff would have alerted inmates to an impending search.
Id. at 1147 (citation omitted).
Despite the affidavit from a prison official attesting that no females actively participated in the strip search and despite the expressed staffing considerations in the affidavit, the Tenth Circuit reversed the grant of summary judgment in favor of the prison officials. See id. at 1147-48. In doing so, the Tenth Circuit explicitly recognized that an inmate’s privacy rights may be violated by a single cross-gender strip search. See id. at 1147.
This litany of cases over the last thirty years has a recurring theme: cross-gender strip searches in the absence of an emergency violate an inmate’s right under the Fourth Amendment to be free from unreasonable searches. Because the cross-gender nature of the search is a critical factor in the strip searches discussed in these cases, we cannot agree with our dissenting colleagues that the gender of the officer conducting the search is irrelevant. See Dissenting Opinion, p. 1150. Interestingly, Maricopa County never challenged the precept that cross-gender strip searches are constitutionally infirm in the absence of an emergency. Rather, it painstakingly attempted to establish that the cross-gender search Byrd underwent was not a strip search. Indeed, Maricopa County’s policy prohibits cross-gender strip searches. The admission implicit in Maricopa County’s determined effort to avoid having the *1147 search characterized as a strip search, coupled with the nearly universal opprobrium expressed in the cases addressing cross-gender strip searches, reflects the extreme degree of unreasonableness presented by the facts of this case.[9]
In this case, the indignity of the non-emergency strip search conducted by an unidentified female cadet was compounded by the fact that there were onlookers, at least one of whom videotaped the humiliating event. For these reasons, we conclude that the cross-gender strip search, as conducted in this case, was unreasonable.[10]

IV. CONCLUSION

We readily acknowledge the deference due prison officials engaged in the admittedly difficult task of administering inmate populations. However, that deference does not extend to sanctioning a clear violation of an inmate’s constitutional rights. See Giles, 746 F.2d at 617; see also Hayes, 70 F.3d at 1146 (“One of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy.”) (citations, alteration and internal quotation marks omitted).
Accordingly, we hold that the cross-gender strip search performed on Byrd was unreasonable as a matter of law under the facts of this case and violated Byrd’s rights under the Fourth Amendment to be free from unreasonable searches. We REVERSE the district court’s entry of judgment as a matter of law in favor of O’Connell and Maricopa County on this claim. We REMAND this case to the district court for further proceedings consistent with this opinion.

. This fact is important because of our undisputed recognition of the "feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers ...” Way v. County of Ventura, 445 F.3d 1157, 1160 (9th Cir.2006), quoting Thompson v. City of Los Angeles, 885 F.2d 1439, 1446 (9th Cir.1989); see also Hayes v. Marriott, 70 F.3d 1144, 1147 (10th Cir.1995). After years of litigation, the dissent in hindsight declares that "it was surely apparent that the cadets were present in an official capacity.” Dissenting Opinion, p. 1153. n.5. However, that apparentness is not reflected in the record.

. The dissent takes issue with Byrd’s testimony that male officers were standing idly by. See Dissenting Opinion, p. 1151 n.4. However, this is precisely the type of evidence considered by the Fifth Circuit in Moore v. Carwell, 168 F.3d 234, 237 (5th Cir.1999) (giving credence to Plaintiff’s contention that male officers were present during the search, thereby suggesting that male officers were available to conduct the searches). Indeed, the referenced testimony of Officer Peterson does not specifically address the availability of the male officers to conduct the searches in question. See id.

. Byrd’s complaint actually referenced his Eighth Amendment right to be free from cruel and unusual punishment. The district court properly recharacterized this claim as a substantive due process claim under the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (explaining that the Due Process Clause applies when "considering the , claims of pretrial detainees”).

. Because O'Connell was acting in her capacity as a cadet with the Maricopa County Sheriffs Office, Maricopa County remained a putative defendant. See Palomar Pomerado Health Sys. v. Belshe, 180 F.3d 1104, 1108 (9th Cir.1999) (“The general rule is that relief sought nominally against a state officer is in fact against the sovereign if the decree would operate against the latter.”) (citations, alterations, and internal quotation marks omitted).

. Because this description is virtually identical to that articulated by our colleagues in dissent, see Dissenting Opinion, p. 1149, we are puzzled by the accusation that we "paint[ed] the facts differently on appeal.” Id.

. Because Byrd did not challenge the constitutionality of the Contraband Policy, and because the district court focused on the facts of the actual search conducted rather than on the provisions of the Contraband Policy, we apply the Bell factors rather than those articulated in Turner v. Safley, 482 U.S. 78, 81, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), which addresses inmate challenges to regulations.

. The dissent denigrates our citation to the findings of this esteemed body of experts, accusing us of failing to defer to the judgment of the prison officials. See Dissenting Opinion, p. 1149 n.2. Our response is two-fold: (1) There is nothing nefarious or unusual about citing to secondary sources to illuminate our analysis, see, e.g., United States v. Weber, 451 F.3d 552, 561 n.13 (9th Cir.2006) (listing cases relying on secondary sources to explain the court’s analysis); and (2) the Maricopa County officials never exercised their "collective wisdom” in this case to decide that cross-gender strip searches were in order. In fact, the officials denied that any strip search was ever conducted. It would be strange indeed if the officials in their “collective wisdom” ordered cross-gender strip searches in this instance when the "collective wisdom” memorialized in the written policy expressly prohibits cross-gender strip searches.

. The dissenting opinion minimizes the intrusiveness of the search by describing it as a "pat-down of a partially-clothed male inmate.” Dissenting Opinion, p. 1151. However, the facts of this case clearly reflect that more than a "pat down" occurred. We have defined a "pat-down search” as one involving no intimate contact with the inmate's body. Grummett, 779 F.2d at 495-96. In contrast, Byrd was subjected to a search that involved twice moving his penis and scrotum aside and separating the cheeks of his buttocks to search inside his anus. Neither was Byrd partially clothed, legally speaking. Rather, he was wearing only pink, nearly see-through *1144 underwear. In most jurisdictions within this circuit, one could not appear in public dressed, (or more precisely undressed) in that manner. See, e.g., Ariz.Rev.Stat. § 13-3501(4) (defining "nudity” as "the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering ...”); Haw.Rev.Stat. § 712-1210 (defining "nude” as "unclothed or in attire, including but not limited to sheer or see-through attire, so as to expose to view any portion of the pubic hair, anus, cleft of the buttocks, genitals ...”). Indeed, the dissent's characterization is inconsistent with Grummett, 779 F.2d at 496, in which we approved cross-gender searches "done ... while the inmates are fully clothed, and thus do not involve intimate contact with the inmates’ bodies.” (emphasis added).
If the search conducted were in fact a pat-down search of a partially clothed inmate, we would probably agree that the search was reasonable. However, because Byrd was subjected to a cross-gender strip search while nearly nude, we conclude that the search was patently unreasonable.

. We omit Jordan v. Gardner, 986 F.2d 1521 (9th Cir.1993) (en banc), from this discussion because a majority of the en banc panel declined to address the Fourth Amendment issue in that case.

. Byrd also challenged the district court's admission of the Video Yearbook and the district court's formulation of an adverse inference instruction. However, during trial, Byrd laid the foundation for an adverse inference instruction when he questioned Arpaio about the video footage recorded on the day of Byrd's search. The district court did not abuse its discretion by admitting the videotape because Byrd opened the door to consideration of this evidence when he questioned Arpaio about the video footage. See United States v. Osazuwa, 564 F.3d 1169, 1173 (9th Cir.2009) (reviewing for abuse of discretion the district court's ruling that a party opened the door for introduction of evidence). Additionally, the district court did not abuse its discretion when it declined to use the exact wording Byrd requested for the adverse inference instruction. Byrd's suggested language would have impermissibly directed the jury to reach a conclusion about a matter of disputed fact. See Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 212 (9th Cir.1988) (explaining that a jury instruction is adequate “even if it does not use the exact words proposed by a party ...”); see also Roberts v. Spalding, 783 F.2d 867, 873 (9th Cir.1986) (approving the district court's rejection of an instruction that directed the jury to reach a particular conclusion regarding a disputed matter of fact).